IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA E. MOORE, | ) | CASE NO.  1:25-CV-00486-DAR |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAVID A. RUIZ |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JONATHAN D. GREENBERG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Barbara Moore ("Plaintiff" or "Moore"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

In February 2022, Moore filed an application for POD and DIB, alleging a disability onset date of November 21, 2021, and claiming she was disabled due to back pain, cognitive issues, neurological issues, fatigue, anxiety, depression, memory issues, concentration issues, sleep issues, and dizziness.  (Transcript

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

("Tr.") 17, 57.)  The application was denied initially and upon reconsideration, and Moore requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 17.)

On October 31, 2023, an ALJ held a hearing, during which Moore, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 6, 2024, the ALJ issued a written decision finding Moore was not disabled.  (*Id.* at 17-27.)  The ALJ's decision became final on January 14, 2025, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On March 11, 2025, Moore filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9-10.)  Moore asserts the following assignment of error:

> (1) The ALJ's RFC finding is not supported by substantial evidence because his evaluation of Shreeniwas Lele, M.D.'s opinions did not comply with the revised regulations for evaluating medical opinion evidence.

(Doc. No. 7 at 13.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Moore was born in August 1967 and was 56 years-old at the time of her administrative hearing (Tr. 17, 26), making her a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(d).  She has at least a high school education.  (Tr. 26.)  She has past relevant work as a staff nurse. (*Id.*)

### B.    Relevant Medical Evidence[2]

On November 30, 2021, Moore saw Shreeniwas Lele, M.D., and reported she was unhappy as a

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Moore challenges only the ALJ's findings regarding her physical limitations, the Court further limits its discussion to Moore's physical impairments.

result of multiple medical issues.  (*Id.* at 461.)  Moore complained of right eye problems consisting of swelling and eyelid drop.  (*Id.*)  She thought she had a stroke, but it resolved.  (*Id.*)  Moore continued to have some laziness in the eye and occasional blurred vision.  (*Id.*)  Moore also complained of "[e]xcruciating low back pain" and leg cramps.  (*Id.*)  She also endorsed weakness, tiredness, fatigue, exhaustion, and diffuse muscle pain.  (*Id.*)  On examination, Dr. Lele found nystagmus of the right eye with the left eye closed but not with both eyes open, "okay" field of vision, no edema of the legs, normal reflexes, normal sensory and motor examinations, and sacroiliac tenderness.  (*Id.*)  Dr. Lele prescribed Votaren gel for Moore's sacroiliac pain, stopped metformin and recommended gentle exercises for Moore's leg cramps, and ordered blood work and an "[i]mmediate detailed eye exam" and brain MRI for Moore's eye issues. (*Id.*)  Dr. Lele noted Moore might need a right orbit MRI and ultrasound for her eye.  (*Id.*)

On December 16, 2021, Moore saw Dr. Lele for follow up and reported right eye drooping in the morning and pressure and leg cramps at night.  (*Id.* at 462.)  She told Dr. Lele that magnesium did not help her leg cramps.  (*Id.*)  Moore continued to complain of weakness, tiredness, fatigue, and exhaustion.  (*Id.*) On examination, Dr. Lele found no edema of the legs and normal reflexes, normal sensory examination, and normal motor examination.  (*Id.*)  Dr. Lele noted right eye drooping and possible glaucoma, for which Moore was seeing an ophthalmologist.  (*Id.*)  Dr. Lele wondered if Moore was experiencing myasthenia.  (*Id.*)  Dr. Lele referred Moore to neurology.  (*Id.*)  A brain MRI revealed a good orbit.  (*Id.*)  Dr. Lele issued a differential diagnosis of restless leg syndrome, continued magnesium, and prescribed Requip.  (*Id.*)

X-rays of Moore's lumbosacral spine taken on February 7, 2022 revealed: Grade 1 anterolisthesis of L5-S1; severe facet disease in the lower lumbar spine, worse at L5-S1; mild to moderate spondylosis of the lumbar spine, most prominent at L1-L2 vertebral levels; and mild degenerative changes in the hips bilaterally.  (*Id.* at 469-70.)

On February 12, 2022, Moore went to the emergency room after falling and was diagnosed with a

3

dislocated left shoulder.  (*Id.* at 361.)

A February 23, 2022 MRI of Moore's lumbar spine revealed multilevel spondylitic changes of the lumbar spine, with mild-to-moderate left-sided neural foraminal stenosis at L5-S1 due to hypertrophic facet changes and spondylolisthesis, and Grade 1, 5 mm anterolisthesis of L5 on S1 with possible right-sided spondylolysis of L5.  (*Id.* at 465-68.)

On May 23, 2022, Moore saw Raed Gasemaltayeb, M.D., and Christopher Geiger, D.O., for evaluation of her right eyelid droopiness, bilateral leg weakness, and feet numbness.  (*Id.* at 475-76.)  Drs. Gasemaltayeb and Geiger noted:

> Patient was in her usual state of health until October 2021 when she developed COVID-19 infection. COVID infection was mild, she did not need to be hospitalized nor mechanically ventilated. However, during that time she developed bilateral distal feet numbness and tingling. She recovered after 21 days after which she developed intermittent complete right eyelid droopiness that was fluctuating on a daily basis. By the end of January, this droopiness has become partial and can be provoked and get worse with fatigue. In addition, she developed fatigable bilateral lower extremity weakness even with brief activity along with trouble going up or down the stairs, getting up from the floor, and intermittent dysphagia to solids and liquids. Her deficits led her to resign from her work as a nurse. Otherwise, she denied blurry vision, double vision, loss of vision, chewing issues, upper extremities weakness or sensory disturbances, fine movement issues, shortness of breath, or bladder/bowel dysfunction.

(*Id.* at 476.)  On examination, Drs. Gasemaltayeb and Geiger found weakness of the hip flexors and extensors bilaterally, weakness of feet eversion bilaterally, decreased pinprick sensation in the right hand up to the distal forearm, decreased sensation to pinprick and vibration in the feet up to the distal shins bilaterally, and hyperreflexia throughout.  (*Id.* at 477.)  However, Drs. Gasemaltayeb and Geiger found no neck pain, upper extremity weakness, or hypertonia.  (*Id.*)  Drs. Gasemaltayeb and Geiger's impressions consisted of neuromuscular junction disorder, MG versus LEMS, myelopathy, compressive versus metabolic, and peripheral neuropathy.  (*Id.*)  Drs. Gasemaltayeb and Geiger ordered blood work and further testing.  (*Id.*)

4

A nerve conduction study and electromyography ("EMG") study conducted on June 14, 2022 were normal, with no evidence of myasthenia gravis or myopathy. (*Id.* at 521-22.)

On August 18, 2022, Moore saw Dr. Lele for follow up and reported ongoing "excruciating" back pain that radiated into her legs. (*Id.* at 464.) Dr. Lele noted that Moore's neurologist thought that she may have transverse myelitis, and her myasthenia gravis workup was "mostly negative." (*Id.*) On examination, Dr. Lele found no edema of the legs, normal reflexes, normal motor and sensory examination, and painful movements of the back. (*Id.*) Dr. Lele ordered an updated MRI of Moore's back and referred Moore to aquatic therapy. (*Id.*)

On October 29, 2022, Moore saw Ronald Peirish, D.O., for a physical consultative examination. (*Id.* at 535.) Moore alleged disability based on worsening back pain with leg weakness, dislocated left shoulder, neurological deficits, cognitive deficits, fatigue, anxiety, depression, memory issues, concentration issues, sleep issues, and dizziness. (*Id.*) She forgot names and had word finding issues. (*Id.*) She told Dr. Peirish she could sit for 30 minutes, stand for 30-60 minutes, walk for 30-60 minutes, and lift 5-10 pounds. (*Id.* at 536.) Moore spent her days trying to go to the gym (she had good days and bad days) and doing chores around the house. (*Id.*) She struggled with vacuuming. (*Id.*) On examination, Dr. Peirish found good hand eye coordination, no balance issues, normal gait with no assistive device, normal sensory examination, negative straight leg raise test bilaterally, difficulty raising left shoulder, left shoulder abduction and forward flexion limited to 90 degrees, and the ability to heel walk, toe walk, and tandem walk. (*Id.* at 537-38.) Dr. Peirish noted Moore could squat and rise from a squat with some difficulty, needing to put her hands on her knees to assist with the movement. (*Id.* at 538.) Moore could rise from a sitting position without assistance and had no problem getting up and down from the exam table. (*Id.*) Dr. Peirish opined:

> With the patient's history of Back, neurological deficits, cognitive deficits, fatigue, anxiety, depression, memory concentration, sleep, dizziness, based on the exam findings today, the patient is able to sit for 60 minutes, stand for 30

minutes, walk for 30 minutes, and lift 10 pounds. The patient does not have any substantial physical limitations. Her medical conditions seem to be stable.

(*Id.* at 539.)

On January 3, 2023, Moore saw Dr. Lele for follow up and reported a sudden loss of control associated with urination, weakness in the legs bilaterally, and numbness and tingling in the arms bilaterally. (*Id.* at 559.)  Moore's neurologist was waiting on further testing to confirm transverse myelitis.  (*Id.*)  Moore also endorsed post-COVID symptoms consisting of extreme fatigue, tiredness, and exhaustion.  (*Id.*)  Moore reported depression because she could not return to work as a nurse due to her medical condition.  (*Id.*)  On examination, Dr. Lele found bilateral hand weakness, antigravity present with diffuse muscle tenderness, a "slightly low" grip, and "questionable" hyperactive reflexes in the lower legs and deep tendon reflexes.  (*Id.*)  Dr. Lele thought cervical radiculopathy was causing "upper motor neuron-type symptoms in the lower legs" and was concerned about cervical stenosis.  (*Id.*)  Dr. Lele ordered an MRI and complete blood work.  (*Id.*)  Dr. Lele noted Moore might need a myelogram and an EMG.  (*Id.*)

An MRI of the cervical spine taken on January 19, 2023 revealed "[m]ild multilevel spondylosis of the cervical spine most prominent from C3-C4, C4-C5, and C5-C6."  (*Id.* at 571-73.)  The MRI further revealed "no high-grade spinal canal or foraminal stenosis."  (*Id.* at 573.)

On February 8, 2023, Moore saw Dr. Lele for follow up and reported continued numbness and tingling in both arms, the inability to hold equipment, and becoming fatigued easily.  (*Id.* at 561.)  Moore told Dr. Lele she had to wake herself up at night and shake her hands to feel better.  (*Id.*)  Moore stated she could not work as a nurse with the numbness and tingling she was experiencing, although she wanted to work.  (*Id.*)  She was waiting to see her neurologist.  (*Id.*)  On examination, Dr. Lele found diffuse tenderness and painful movements of the neck, pain along the arm, "slightly low" grip, normal cranial nerves, normal reflexes, and normal motor and sensory examinations.  (*Id.*)  Dr. Lele thought a nerve conduction study was appropriate to see any impingement that might be causing the numbness and tingling in Moore's arms.  (*Id.*)

6

Dr. Lele diagnosed Moore with "very diffuse" cervical spondylosis disease and referred Moore to neurosurgery, although he did not think surgery would help.  (*Id.*)

A March 9, 2023 EMG revealed "mild median mononeuropathy without active denervation" in the left upper extremity, no evidence of median mononeuropathy in the right upper extremity, and no evidence of cervical radiculopathy or ulnar entrapment in either upper extremity.  (*Id.* at 680.)

On March 13, 2023, Moore saw Dr. Geiger for follow up and reported bilateral lower extremity weakness and decreased dexterity in her hands bilaterally.  (*Id.* at 563.)  Moore also endorsed lower back pain that worsened with prolonged standing or walking but that improved with leaning forward.  (*Id.*)  On examination, Dr. Geiger found full strength, hyperreflexia, and numbness over the right middle finger and in a length dependent pattern in the lower extremities.  (*Id.*)  Dr. Geiger noted that there was "likely a strong lower back pain component" to Moore's "fluctuating lower extremity weakness."  (*Id.*)  Dr. Geiger further noted the "etiology of her decreased hand dexterity is unclear" and recommended a "watch and wait" approach.  (*Id.*)  Dr. Geiger recommended lumbosacral x-rays to look for dynamic instability or worsening of anterolisthesis, as well as water therapy.  (*Id.*)

X-rays of the lumbar spine taken on March 31, 2023 revealed "[a]dvanced lumbar degenerative changes at all levels."  (*Id.* at 569-70.)  The radiologist noted that the 1.5 cm anterolisthesis L5 on S1 was similar to the prior study.  (*Id.* at 570.)

On April 5, 2023, Moore saw Dr. Lele for follow up and reported severe neck pain that radiated into her arm and low back pain that radiated into her leg.  (*Id.* at 590.)  She told Dr. Lele her neurologist did not think surgery would help but her condition was worsening, and she could not work.  (*Id.*)  Nothing helped her pain and Gabapentin caused weight gain.  (*Id.*)  Moore endorsed insomnia and difficulty in maintaining her weight.  (*Id.*)  On examination, Dr. Lele found painful movements of the neck, normal cranial nerves, and normal motor and sensory examinations.  (*Id.*)  Dr. Lele noted Neurontin was not a good option for

7

Moore's neck pain with radiculopathy and low back pain, and recommended underwater exercises and anti-inflammatories as needed.  (*Id.* at 591.)  Dr. Lele prescribed amitriptyline for Moore's insomnia and neuropathic pain, which he noted had worked for Moore before.  (*Id.*)

On June 16, 2023, Moore saw Dr. Lele for follow up and reported "excruciating back pain" that radiated into her left leg along with numbness and tingling that was not improved with weight loss.  (*Id.* at 627.)  Moore also endorsed left leg weakness.  (*Id.* at 628.)  On examination, Dr. Lele found no edema, minimal tingling and numbness of the left thumb, normal cranial nerves, normal sensory and motor examinations, normal reflexes, painful back movements, and limited straight leg raise.  (*Id.* at 627.)  Dr. Lele ordered physical therapy.  (*Id.*)

On June 22, 2023, Moore saw Gregory Benko, PT, DPT, for physical therapy and reported back pain, left thigh and ankle pain, and foot drop.  (*Id.* at 649, 651.)  Moore told Benko her back and left thigh pain was constant, and her left ankle pain was intermittent.  (*Id.*)  Moore rated her pain as a 5-10/10.  (*Id.*)  Moore also reported bilateral leg weakness.  (*Id.* at 650.)  Moore told Benko she could walk or sit for less than 10 minutes and there were days when she must stay in bed if she did too much the day before.  (*Id.*)  On examination, Benko found impaired range of motion of the left hip, ankle, great toe, thigh, and foot, as well as moderate restriction and end range pain with back extension.  (*Id.*)

On June 26, 2023, Moore saw Benko for her second physical therapy session and reported no changes despite good compliance with her home exercise program.  (*Id.* at 652-53.)  Moore told Benko she had fallen over the weekend after being tripped by her neighbor's dog.  (*Id.* at 652.)  She stated she had spent about an hour in the pool and while it felt good on her back, she did not notice any increase in ankle strength.  (*Id.*)

On June 29, 2023, Moore saw Stephen Molek III, ATC, PTA, for physical therapy and reported she was going to continue with her home exercise program and hold off on continuing with physical therapy

8

until she got her new insurance.  (*Id.* at 654-55.)  Molek noted Moore tolerated the exercises well, although she fatigued quickly with core and hip strengthening exercises.  (*Id.* at 654.)  She continued to be challenged with balance exercises and struggled with left "DF strength."  (*Id.*)  Moore reported feeling a little better after the session.  (*Id.*)  Molek noted no change in pain but improved joint mobility/ROM, strength, and posture.  (*Id.*)

On July 19, 2023, Moore saw Dr. Lele for follow up and reported partial left foot drop that had happened suddenly.  (*Id.* at 629.)  Moore could not perform complete dorsiflexion, and dorsiflexion and plantar flexion were weak.  (*Id.*)  Moore told Dr. Lele she was using a cane and walker and that she felt like she was dragging her left leg.  (*Id.*)  Her left foot drop was causing falls.  (*Id.*)  On examination, Dr. Lele found no edema of the legs, painful movements, partial foot drop on the left, incomplete dorsiflexion on the left, normal cranial nerves, normal reflexes, and normal sensory and motor examinations.  (*Id.*)  Dr. Lele noted he was "very worried" and ordered an immediate MRI, as well as an EMG for both legs.  (*Id.*)  Dr. Lele advised use of a brace and noted Moore might need a new brace to support her ankle and foot, as well as physical therapy.  (*Id.*)

A lumbar spine MRI taken on July 31, 2023 revealed 11 degree levoscoliosis and disc disease of the lower thoracic and lumbar spine.  (*Id.* at 659-60.)

On August 17, 2023, Moore saw Dr. Lele for follow up and reported continuing back pain radiating to her leg, drop foot on the left, weakness, tiredness, fatigue, and exhaustion.  (*Id.* at 632.)  Dr. Lele noted Moore was using a cane to keep from falling.  (*Id.*)  On examination, Dr. Lele found left leg weakness, 3-4/5 strength on the left, 4-5/5 strength on the right, equivocal plantar reflex on the left side, and partial foot drop on the left.  (*Id.*)  Dr. Lele diagnosed Moore with lumbar radiculopathy with possible left foot drop that Dr. Lele thought was serious.  (*Id.*)  He ordered an immediate EMG and referred her to another doctor

9

for possible microsurgery.  (*Id.*)  Dr. Lele noted Moore needed a neurosurgical opinion and nerve conduction study.  (*Id.*)

An abnormal August 29, 2023 EMG revealed left L5 lumbar radiculopathy with active denervation and without any chronic neurogenic changes.  (*Id.* at 665.)

On September 8, 2023, Moore saw Dr. Lele for follow up and reported continued back pain that radiated to her legs, left greater than right at times, and an inability to sit, walk, or perform consistent work.  (*Id.* at 634.)  Dr. Lele noted Moore was unsure whether she wanted surgery.  (*Id.*)  Moore told Dr. Lele the pain was affecting her ability to function and perform day to day work.  (*Id.*)  Moore also endorsed fatigue throughout the day.  (*Id.*)  She needed to lay down and rest her back and legs for half an hour to one hour every two to three hours, as well as stretch, so she could remain functional.  (*Id.*)  Moore told Dr. Lele the pain was worse after walking.  (*Id.*)  On examination, Dr. Lele found no edema, normal reflexes, normal motor and sensory examinations, painful movements of the back, and limited and equivocal straight leg raise.  (*Id.*)  Dr. Lele continued Moore's medication and noted that surgery "may not be a desirable option and may not give her full relief."  (*Id.* at 635.)  Dr. Lele encouraged Moore to obtain a microsurgery neurological opinion to improve her quality of life.  (*Id.*)

On October 10, 2023, Dr. Lele completed a Medical Source Statement and opined that Moore could stand for 15-30 minutes at one time, walk for 15 minutes or less at one time, sit for 30 minutes at one time and for less than 60 minutes total during a workday, lift 5 pounds occasionally, and lift less than 5 pounds frequently.  (*Id.* at 673-75.)  Dr. Lele further opined that Moore needed to elevate her legs to above waist level frequently during an eight-hour workday.  (*Id.* at 674.)  Dr. Lele further opined that Moore would be off-task at least 20% of a workday in addition to standard breaks.  (*Id.* at 675.)  Dr. Lele provided the following explanations for his opinion: left foot drop; bilateral leg weakness; "MRI finding correlate with symptoms"; "EMG shows radiculopathy with denervation in left"; inability to concentrate as a result of

10

chronic pain, depression, and drowsiness; constant lumbar radiculopathy pain that was a 6/10; cervical radiculopathy pain that was a 7/10 and worse with head movements; difficulty concentrating or driving; and the need to stretch and lie down frequently.  (*Id.*)  Medication side effects included drowsiness, dizziness, muscle tension, and weakness.  (*Id.*)  Dr. Lele further opined that Moore "[c]an't do her normal own job/own profession productively (40Hr/wk)."  (*Id.*)

## C.  State Agency Reports

On November 11, 2022, Gerald Klyop, M.D., reviewed the file and opined that Moore could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.  (*Id.* at 62-63.)  She could stand and/or walk for about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday.  (*Id.* at 62.)  She could frequently climb ramps or stairs but never climb ladders, ropes, or scaffolds.  (*Id.*)  She could frequently balance, stoop, kneel, crouch, and crawl.  (*Id.*)  She could frequently lift overhead with her left shoulder.  (*Id.* at 63.)

On April 17, 2023, on reconsideration, Mehr Siddiqui, M.D., affirmed Dr. Klyop's findings.  (*Id.* at 72-73.)

## D.  Hearing Testimony

During the October 31, 2023 hearing, Moore testified to the following:

- She has not seen a surgeon regarding neurosurgical options.  (*Id.* at 40.)  She has discussed it with her primary care physician because he was concerned about her left foot drop.  (*Id.*)  He explained that because of the degeneration, surgery may not fix the problem.  (*Id.*)  She is very hesitant to have any kind of surgical procedure done.  (*Id.*)  She has not ruled out seeing a neurosurgeon.  (*Id.* at 40-41.)  She is concerned that surgery may make things worse, which is a good possibility.  (*Id.* at 41.)

- She experiences pain in her neck and lower back.  (*Id.* at 43.)  The pain is constant, and she never has complete pain relief.  (*Id.* at 44.)  She takes an anti-inflammatory medication and a muscle relaxer.  (*Id.*)  She needs to lay down in bed with a pillow under her knees to get any kind of pain relief.  (*Id.*)  She must lay down for an hour or two before she can get up and start moving again.  (*Id.*)

- She can do light household chores.  (*Id.*)  She can sweep but cannot vacuum.  (*Id.*)  She can do some laundry, but she uses a wheeled cart that she takes to the washer and uses

11

to take the clothes from the dryer.  (*Id.*)  She sits on the couch to fold the clothes.  (*Id.*)
Doing chores wears her out and makes her feel like she has worked all day.  (*Id.* at 47.)
She feels exhausted and must sit down on the recliner.  (*Id.* at 47-48.)  She must take
frequent breaks.  (*Id.* at 48.)

- Standing for more than 30 minutes causes "terrible back pain" and worsens her leg
  weakness.  (*Id.* at 44.)  She experiences leg weakness in both legs, but it's worse on the
  left.  (*Id.* at 45.)

- Her neck pain radiates down her arms and into her hands at times.  (*Id.*)  She struggles
  to write or perform fine motor movements.  (*Id.*)  She could not thread a needle.  (*Id.*)
  She has problems with both hands, but her left hand is worse.  (*Id.*)  She has trigger
  finger in her right middle finger.  (*Id.*)  She is left-handed.  (*Id.*)

- She went to physical therapy.  (*Id.*)  She goes to a gym and uses the therapy pool on the
  weekends.  (*Id.* at 45-46.)  She floats with a pool noodle and stretches her spine.  (*Id.* at
  46.)  The pool helps, but it doesn't get rid of her pain.  (*Id.*)

- She still experiences post-COVID symptoms consisting of fatigue and cognitive issues.
  (*Id.*)  She has to make a list, or she forgets things.  (*Id.*)  She also has anxiety, and she
  has been staying home more because she is afraid to get sick again.  (*Id.*)  She cannot
  go out and do much because of her pain.  (*Id.*)  She struggles with concentration.  (*Id.*)
  She starts a task but does not finish it before going on to something else.  (*Id.* at 47.)
  She cannot maintain attention.  (*Id.*)  She naps for about two hours every day.  (*Id.*)

- She experiences left arm weakness since she fell and dislocated her shoulder.  (*Id.* at
  48.)  She cannot lift more than 10 pounds.  (*Id.*)

- She has fallen several times.  (*Id.*)  She fell the day before when she went outside to
  pick up a package.  (*Id.*)  She hurt her arm and her leg.  (*Id.*)

- On days when she is very weak, she uses a cane that she got from her mother.  (*Id.*)  She
  uses the cane at the store because she is afraid of falling.  (*Id.*)  Her left leg will give out
  without warning because of her foot drop, and she will fall.  (*Id.*)

- She is not taking prescription pain medication.  (*Id.* at 49.)  She tried gabapentin in the
  past and did not tolerate it.  (*Id.*)  She takes her anti-inflammatory, amitriptyline for
  anxiety, depression, and insomnia, and Motrin.  (*Id.*)

The VE testified Moore had past work as a staff nurse.  (*Id.* at 51.)  The ALJ then posed the following

hypothetical question:

> For the first hypothetical, assume the individual would be limited to work at the
> light exertional level.  The individual cannot climb ladders, ropes, or scaffolds.
> The individual could frequently climb ramps and stairs, balance, stoop, kneel,
> crouch, or crawl.  Overhead reaching with the left dominant upper extremity is
> limited to frequent.  And this person must avoid all exposure to unprotected

heights or dangerous moving machinery.  Would that individual be able to perform any of Ms. Moore's past work?

(*Id.* at 51-52.)

The VE testified the hypothetical individual would not be able to perform Moore's past work as a staff nurse.  (*Id.* at 52.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier, information clerk, and office helper.  (*Id.*)  The VE further testified at the light level of exertion, skills would transfer to office nursing positions, but not at the sedentary level. (*Id.* at 52-53.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office nurse, school nurse, and occupational health nurse. (*Id.* at 53.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from

13

a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Moore was insured on the alleged disability onset date, November 21, 2021, and remains insured through December 31, 2026, the date last insured ("DLI").  (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Moore must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2.    The claimant has not engaged in substantial gainful activity since November 21, 2021, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: degenerative joint and degenerative disc disease of the lumbar spine and shoulder dislocations (20 CFR 404.1520(c)).

14

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps and stairs, never ladders, ropes or scaffolds; frequent balance, stoop, kneel, crouch or crawl; frequent overhead reaching with the left dominant upper extremity; and must avoid all exposure to unprotected heights or dangerous moving machinery.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August **, 1967 and was 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant became 55 years old on August **, 2022 and changed age category to advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2021, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-27.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*

15

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

16

Case: 1:25-cv-00486-DAR  Doc #: 11  Filed:  11/17/25  17 of 23.  PageID #: 757

Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her sole assignment of error, Moore argues that the ALJ's analysis of Dr. Lele's opinions "failed to satisfy the requirements of 20 CFR § 404.1520c."  (Doc. No. 7 at 15.)  Regarding supportability, Moore asserts that the ALJ failed to consider "any of the bases for Dr. Lele's opinion," which Moore maintains violates the plain language of the regulation.  (*Id.* at 15-16.)  Regarding consistency, Moore argues that the ALJ's "conclusory statement" that "'the evidence establishes that the claimant is not that limited'" fails to satisfy the regulation, as the ALJ "must identify evidence that is actually inconsistent with the medical opinion at issue to justify their discounting of the opinion."  (*Id.*) (citing *Lester v. Saul*, 2020 WL 8093313, at *12 (N.D. Ohio Dec. 11, 2020)).

The Commissioner argues that substantial evidence supports the ALJ's finding that Dr. Lele's opinion was unpersuasive.  (Doc. No. 9 at 6.)  The Commissioner asserts that the ALJ explained that Dr. Lele's opinion was unsupported by Dr. Lele's examinations and inconsistent with other evidence in the record.  (*Id.*)  The Commissioner maintains that the ALJ "further observed that Dr. Lele's opinion was inconsistent with . . . the prior administrative medical findings of the state agency physicians."  (*Id.* at 8.)

In reply, Moore argues that the ALJ's error in failing to discuss the supportability of Dr. Lele's opinion is compounded by the fact that "Dr. Lele provided ample support for his opinion that went unmentioned by the ALJ."  (Doc. No. 10 at 1.)  Moore asserts that the Commissioner's brief impermissibly "attempts to construct the missing logical bridge between the evidence and the ALJ's conclusion that Dr.

Lele's opinion was not persuasive." (*Id.* at 2-3.) In addition, Moore maintains that the Commissioner's brief mischaracterizes the ALJ's findings, as the ALJ never found that Dr. Lele's examinations "did not support the 'extreme' limitations contained within his opinion" or that Dr. Lele's opinions were inconsistent with the opinions of the state agency reviewing physicians. (*Id.* at 3.)

Since Moore's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most

important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of

medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case
> records containing many types of evidence from different sources, it is not
> administratively feasible for us to articulate in each determination or decision
> how we considered all of the factors for all of the medical opinions and prior
> administrative medical findings in your case record. Instead, when a medical
> source provides multiple medical opinion(s) or prior administrative medical
> finding(s), we will articulate how we considered the medical opinions or prior
> administrative medical findings from that medical source together in a single
> analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this
> section, as appropriate. We are not required to articulate how we considered
> each medical opinion or prior administrative medical finding from one medical
> source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of
> this section) and consistency (paragraph (c)(2) of this section) are the most
> important factors we consider when we determine how persuasive we find a
> medical source's medical opinions or prior administrative medical findings to
> be. Therefore, we will explain how we considered the supportability and
> consistency factors for a medical source's medical opinions or prior
> administrative medical findings in your determination or decision. We may, but
> are not required to, explain how we considered the factors in paragraphs (c)(3)
> through (c)(5) of this section, as appropriate, when we articulate how we
> consider medical opinions and prior administrative medical findings in your
> case record.

> (3) Equally persuasive medical opinions or prior administrative medical
> findings about the same issue. When we find that two or more medical opinions
> or prior administrative medical findings about the same issue are both equally
> well-supported (paragraph (c)(1) of this section) and consistent with the record
> (paragraph (c)(2) of this section) but are not exactly the same, we will articulate
> how we considered the other most persuasive factors in paragraphs (c)(3)
> through (c)(5) of this section for those medical opinions or prior administrative
> medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical

opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered

the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

In a single paragraph in the RFC analysis, the ALJ discussed Moore's back pain as follows:

> The claimant has a history of back pain. The claimant underwent bilateral hip x-rays on February 7, 2022 which showed grade 1 anterolisthesis of L5-S1 with severe facet disease in the lower lumbar spine, worse at L5-S1; mild to moderate spondylosis of the lumbar spine, most prominent at L1-L2 vertebral levels and mild degenerative changes in the hips bilaterally (Exhibit 9F, pp. 41, 43). She then underwent an MRI of the lumbar spine on February 23, 2022 which demonstrated multilevel spondylitic changes of the lumbar spine with mild to moderate left-sided neural foraminal stenosis at L5-S1 due to hypertrophic facet changes and spondylolisthesis; and grade 1, 5 mm anterolisthesis of L5 on S1 with possible right-sided spondylosis of L5 (Exhibit 9F, pp. 32, 35). A lumbar spine x-ray on March 31, 2023 showed advanced lumbar degenerative changes with 1.5 cm anterolisthesis similar to prior study (Exhibit 14F, p. 13). An MRI of the lumbar spine dated July 31, 2023 showed disc disease of the lower thoracic and lumbar spine (Exhibit 18F, p. 24). EMG and nerve conduction studies performed on August 29, 2023 showed left L5 radiculopathy (Exhibit 18F, p. 29). Treatment records also note cervical spondylosis. An MRI of the cervical spine performed on January 19, 2023 showed mild spondylosis without significant spinal stenosis (Exhibit 14F, pp. 4, 7, 11, 16). While physical exams have noted reflexes at 3+, and decreased sensation to pinprick in the bilateral hands and bilateral fee at times, she has had normal reflexes and normal sensation on most occasions. She also has normal muscle strength and a normal gait (Exhibits 11F, pp. 5. 6. 8-12; 14F, pp. 2, 4, 10; 15F, pp. 6, 12- 13; 16F, pp. 3, 10, 22; 17F, p. 2). Treatment has been conservative and has included physical therapy, pool therapy, and Flexeril (Exhibit 18F, pp. 16, 36).

(Tr. 23.)

In finding Dr. Lele's opinion partially persuasive, the ALJ found as follows:

> The record also includes a medical source statement completed by Shreeniwas Lele, M.D. dated October 10, 2023. Dr. Lele noted that the claimant can stand for 15-30 minutes, walk for up to 15 minutes and sit for 30 minutes at one time but less than 60 minutes in a workday. Dr. Lele further indicated that the claimant can lift up to 5 pounds occasionally and less than five pounds frequently. The doctor indicated that the claimant can occasionally bend, stoop, balance, perform fine manipulation with the right hand, raise the left arm over

20

shoulder level and reach laterally. He also stated that the claimant can occasionally tolerate dust, smoke and fumes exposure and perform lateral neck movements. Dr. Lele further indicated that the claimant can frequently perform gross manipulation, fine manipulation on the left, raise the right arm overhead and reach laterally, the claimant can reach in front with both the right and left arms frequently, frequently operate a motor vehicle, tolerate heat and cold, noise exposure, and up and down neck movement. Moreover, he indicated that the claimant can never work around dangerous equipment or tolerate heights. Finally, he indicated that the claimant would be off task 20% of the time and would need to frequently elevate her legs . This opinion is not persuasive because overall, the evidence establishes that the claimant is not that limited. Dr Lele also indicated that the claimant can't do her normal job. However, this is a determination reserved for the Commissioner of the Social Security Administration and therefore, is neither valuable nor persuasive pursuant to 20 CFR 404.1520b(c) (Exhibit 19F).

Similarly, in a treatment record date June 16, 2023, Dr. Lele noted that the claimant asked about returning to work but he noted that considering the tingling and numbness in the left leg, to do her profession, which is very demanding, is probably a risk to herself. Such a statement is also neither valuable nor persuasive because it is a determination reserved for the Commissioner of the Social Security Administration pursuant to 20 CFR 404.1520b(c) (Exhibit 17F, p. 3). Moreover, in a treatment record dated September 28, 2023, he stated that the claimant needs frequent rest, cannot work continuously, sit or walk. This statement is not persuasive because it is vague and does not set for specific limitation. In addition, he stated that he doubted that she can enter any employment on a full-time basis, and that even part time, she would have a tough time focusing because of pain and side effects from the medication. This statement is also a determination reserved for the Commissioner of the Social Security Administration and as such, is neither valuable nor persuasive pursuant to 20 CFR 404.1520b(c) (Exhibit 18F, p. 34).

In sum, the evidence set forth above establishes that the claimant has a residual functional capacity to perform light work except frequent climbing of ramps and stairs, never ladders, ropes or scaffolds; frequent balance, stoop, kneel, crouch or crawl; frequent overhead reaching with the left dominant upper extremity; and must avoid all exposure to unprotected heights or dangerous moving machinery.

(*Id.* at 25.)

The undersigned finds the ALJ erred in his evaluation of Dr. Lele's opinions.  First, as Moore argues, Dr. Lele provided the following explanations for the limitations in his opinion: left foot drop; bilateral leg weakness; "MRI finding correlate with symptoms"; "EMG shows radiculopathy with denervation in left";

inability to concentrate as a result of chronic pain, depression, and drowsiness; constant lumbar radiculopathy pain that was a 6/10; cervical radiculopathy pain that was a 7/10 and worse with head movements; difficulty concentrating or driving; and the need to stretch and lie down frequently.  (*Id.* at 675.) Nowhere in the ALJ's decision does the ALJ acknowledge the support Dr. Lele included in his opinion as the basis for the limitations he opined, let alone explain how these findings fail to support the opined limitations.  Compounding this error is the fact that Dr. Lele rendered his opinion on October 10, 2023, a mere 21 days before the hearing.  Therefore, Dr. Lele's opinion was the most recent medical opinion evidence in the record.

Nor does reading the opinion as a whole save the ALJ's failure to properly evaluate Dr. Lele's opinions.  As discussed above, the ALJ reduced years of treatment for back pain into one paragraph.  (*Id.* at 23.)  All the records the ALJ cites in support of normal findings predate the August 29, 2023 EMG showing left L5 radiculopathy with denervation.  (*Id.*)  In addition, the ALJ cherry-picks those records, highlighting only normal findings while omitting findings supportive of disability, including weakness in both hands, diffuse muscle tenderness, "slightly low" grip strength, painful back movements, and limited straight leg raise.  (*Id.* at 559, 627.)

A word must also be said about the Commissioner's brief.  As Moore points out in her reply, nowhere in the ALJ's decision did the ALJ "observe[] that Dr. Lele's opinion was inconsistent with … the prior administrative medical findings of the state agency physicians."  (Doc. No. 9 at 8-9.)  Such argument constitutes impermissible *post-hoc* rationalization and cannot serve to justify the ALJ's findings.

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

In addition, nowhere in the RFC analysis does the ALJ discuss Moore's neck pain despite acknowledging Moore's testimony concerning her neck pain. The ALJ also fails to discuss several other findings supportive of disability in the record, including painful neck movements, diffuse neck tenderness, left leg weakness, 3-4/5 muscle strength on the left, and partial foot drop on the left. (Tr. 561, 590, 632.) Nor does the ALJ acknowledge, in citing conservative treatment as grounds for finding Moore less limited than alleged, that Dr. Lele repeatedly expressed concern that surgery would not fix the problem (*see, e.g., id.* at 561, 635) and that Moore's neurologist did not think surgery would help. (*Id.* at 590.) Nor does the ALJ discuss Moore's limited activities of daily living. (*Id.* at 23-25.)

It is well established that the ALJ may not ignore or overlook contrary lines of evidence. *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).

Remand is required.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

Date: November 17, 2025

    *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**